Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000013
22-MAY-2015
07:53 AM

CAAP-11-0000013

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


JOSEPH A. BRESCIA, Plaintiff-Appellee,
v.
KA'IULANI EDENS-HUFF; PUANANI ROGERS; DAYNE GONSALVES;
LOUISE LISTMAN also known as LOUISE SAUSEN; JEFF CHANDLER; HALE
MAWAE; and DOE DEFENDANTS 1-200, Defendants-Appellants

and

JEFF CHANDLER and ANGIE NORA PUANANI ROGERS,
Third-Party Plaintiffs-Appellants,
v.
ALAN S. DOWNER, in his official capacity as Administrator
of the State Historic Preservation Division of the Department
of Land and Natural Resources; SUZANNE CASE, in her capacity
as the Director of the Department of Land and Natural
Resources;[1] JOHN DOES 1-10; JANE DOES 1-10; and
DOE GOVERNMENTAL UNITS OR OTHER ENTITIES 1-20,
Third-Party Defendants-Appellees.


APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CIVIL NO. 08-1-0107)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Foley and Leonard, JJ.)

This case arises out of attempts by Jeff Chandler
(Chandler) and Angie Nora Puanani Rogers (Rogers) to prevent
Joseph A. Brescia (Brescia) from building a residence on property
he owned on which Native Hawaiian burials had been found.

---

[1] Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2010), Alan S. Downer and Suzanne Case have been automatically substituted as parties for Pua Aiu and Laura Thielen, respectively, who were sued in their official capacities.

Brescia filed a trespass action against Chandler, Rogers, and other Native Hawaiians who allegedly entered and remained on his property to block the construction.  Chandler and Rogers filed counterclaims against Brescia and third-party complaints against the Director of the Department of Land and Natural Resources and the Administrator of the State Historic Preservation Division in their official capacities (collectively, the "State").  Chandler's and Rogers's counterclaims and third-party complaints sought declaratory relief concerning the State's actions in approving the burial treatment plan for Brescia's property and injunctive relief to enjoin all construction by Brescia until the State complied with its duties under the Historic Preservation Law, Hawaii Revised Statutes (HRS) Chapter 6E.

Chandler and Rogers subsequently entered into a settlement agreement with Brescia, in which they agreed to the dismissal and release of all claims against each other.  Pursuant to the settlement, Chandler and Rogers relinquished all claims against Brescia that sought (1) to enjoin Brescia's construction of his residence or (2) to invalidate the State's approval of the burial treatment plan for Brescia's property or any other government approvals necessary to construct his residence.

Given the settlement between Brescia, Chandler, and Rogers, the controversy underlying this case regarding Brescia's construction of his residence and the treatment of the Native Hawaiian burials on his property is moot.  The critical question in this appeal is whether exceptions to the mootness doctrine apply that would warrant a judicial determination of Chandler's and Rogers's claims for declaratory relief against the State.  As explained below, we conclude that the exceptions to the mootness doctrine asserted by Chandler and Rogers do not apply under the circumstances of this case.  Accordingly, we affirm the decisions of the Circuit Court of the Fifth Circuit (Circuit Court)[2/] to: (1) grant the State's motion for summary judgment against

---

[2/] The Honorable Kathleen N.A. Watanabe presided.

2

Chandler and Rogers to the extent that the Circuit Court ruled that Chandler's and Roger's claims against the State were moot, resulting in the dismissal of the claims on mootness grounds;[3/] (2) deny Chandler's and Rogers's motions for summary judgment against the State; and (3) deny Chandler's and Rogers's motion to amend or supplement their third-party complaints.

BACKGROUND

I.

In 2000, Brescia purchased a 15,677 square-foot lot in the Wainiha Subdivision II, situated in Ha'ena, Kaua'i (Property). In order to develop the Property, Brescia applied to the Kaua'i County Planning Commission (Planning Commission) for approval of his proposal to construct a single-family residence on the Property. In December 2007, the Planning Commission conditionally approved Brescia's proposal to construct a 2,355-square-foot single-family residence, resting approximately eight feet above ground on columns built on concrete footings.[4/] The conditions imposed included: (1) excavation at the foundation locations to look for archaeological findings, (2) reporting the discovery of any archaeological findings to the State Historic Preservation Division (SHPD) of the Department of Land and Natural Resources (DLNR) and the County Planning Department, and (3) that "[n]o building permit shall be issued until requirements of the [SHPD] and the Burial Council have been met."

Brescia had an archaeological inventory survey (AIS) conducted on the Property by Scientific Consultant Services, Inc. (SCS). The AIS was conducted in phases. During the AIS, thirty

---

[3/] The Circuit Court's determination that the case had become moot was not a resolution of Chandler's and Rogers's claims against the State on the merits, but rather resulted in the dismissal of the claims on the ground that they were no longer justiciable due to mootness.

[4/] Brescia redesigned and relocated his proposed residence multiple times in order to comply with various state and county requirements, including shoreline setbacks. See Brescia v. N. Shore Ohana, 115 Hawai'i 477, 168 P.3d 929 (2007). As a result of increasingly restrictive shoreline setbacks, the buildable area of the Property was limited to a triangle-shaped parcel of approximately 4,200 square feet.

sets of Native Hawaiian burials were identified.  Because these burials were discovered during the AIS, they were considered "previously identified" remains and were subject to the authority of the Kaua'i/Ni'ihau Island Burial Council (KNIBC).[5]  The results of the AIS report were presented to SHPD, and by letter dated January 24, 2008, Nancy McMahon (McMahon), SHPD's Acting Archaeology Branch Chief and Kaua'i Archaeologist, accepted Brescia's AIS.

## II.

Brescia prepared a burial treatment plan (BTP) that, with the approval of SHPD, was presented to the KNIBC for review. Brescia's initial BTP (BTP-1) proposed the relocation and reinternment of six burials on the Property that would be within or very near the construction footprint of the residence, and he proposed to preserve in place the remaining twenty-four burials. The KNIBC considered BTP-1 at a meeting held on February 7, 2008. The KNIBC decided to defer their decision on BTP-1.  In the interim, Brescia revised BTP-1 to request the relocation of an additional burial, for a total of seven burial relocations. After hearing public testimony in opposition to the relocation of the burials and the construction of Brescia's proposed residence, the KNIBC voted on April 3, 2008, to preserve in place all thirty burials located on the Property.

Brescia then prepared a revised BTP (BTP-2).  Under BTP-2, the seven burials located within the construction footprint of the proposed residence would be encased "by CMU or a concrete jacket," below the surface, with the top of each CMU

---

[5] Hawaii Administrative Rules (HAR) § 13-300-2 (1996) defines "previously identified" to mean "burial sites containing human skeletal remains and any burial goods identified during archaeological inventory survey and data recovery of possible burial sites, or known through oral or written testimony."  HRS § 6E-43(b) (2009), provides in relevant part that "[t]he appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burials is warranted[.]"

capped for permanent preservation.⁶/ The concrete structures would "remain in the ground to protect the burials through time, with sand being used to cover the CMU/concrete jacket to the surface, at which juncture common lawn grass will be placed." The remaining twenty-three burials located outside the footprint of the proposed residence would be preserved in place and, at a minimum, would have a fifteen-foot buffer from the nearest ground-altering activity. Each of the burials was subject to GPS recordation and the placement of a metal tag, so their position would be known and recorded on all property maps and construction plans for the lot. The locations of the burials would also be recorded with the Bureau of Conveyances.

Without first consulting with the KNIBC, SHPD approved BTP-2 on April 24, 2008. Following SHPD's approval, Brescia obtained the necessary permits to begin construction on his Property.

### III.

On June 3, 2008, Brescia planned a blessing to commence construction on the Property. On that date, Chandler, Rogers, and other Native Hawaiians allegedly entered and remained on the Property in order to prevent construction. On June 12, 2008, Brescia filed an amended complaint (Brescia's Complaint) for injunctive relief and damages against Chandler, Rogers, and others who Brescia claimed participated in the June 3, 2008, incident, alleging trespass, private nuisance, tortious interference with contract, and other causes of action. On July 18, 2008, Chandler filed an amended answer to Brescia's Complaint, a counterclaim against Brescia, and a third-party complaint against the State, specifically the Director of DLNR and the Administrator of SHPD in their official capacities. On

_____

⁶/ BTP-2 also refers to the "CMU/concrete jackets" as "small crypts," which "will provide both interim and permanent preservation measures as once set in place, they will not be removed from the soil matrix surrounding the seven burials."

September 26, 2008, Rogers filed a similar answer, counterclaim, and third-party complaint.

Chandler's and Rogers's Counterclaims/Third-Party Complaints sought declaratory and injunctive relief against Brescia and the State. Chandler's Counterclaim/Third-Party Complaint asserted claims regarding SHPD's alleged failure to: (1) "preserve [the] burial site on [Brescia's Property] as determined by KNIBC"; (2) consult with the KNIBC prior to approving BPT-2; and (3) provide information to and properly advise the KNIBC with respect to the proposed construction on Brescia's Property. Rogers's Counterclaim/Third-Party Complaint asserted the same basic claims but added a claim regarding SHPD's alleged failure to assure submission of an adequate burial treatment plan for Brescia's Property.

In their prayers for relief, Chandler and Rogers sought declaratory judgment regarding the scope of the burial councils' authority to make preservation-in-place determinations; SHPD's obligation to provide burial councils with accurate information and proper advice; the failure of SHPD to provide the KNIBC with accurate information and proper advice in connection with the KNIBC's decisions related to Brescia's Property; and the failure of SHPD to consult with the KNIBC prior to approving BTP-2, thereby rendering SHPD's approval invalid. Chandler and Rogers also prayed for an injunction to enjoin "any and all construction" on Brescia's Property until and unless the State correctly advises the KNIBC of its duties, powers, and roles and provides the KNIBC, all appropriate Hawaiian organizations, and any lineal descendants the opportunity to participate in formulating the specific "mitigation and protective measures to implement [KNIBC's] determination to preserve all burials in place on [Brescia's] Property."

IV.

On July 28, 2008, Chandler filed a motion for preliminary injunction pursuant to HRS § 6E-13(b) (2009)[7] to stop Brescia from any further construction on the Property until a decision on the merits of the case could be made.  After holding hearings on the motion, the Circuit Court concluded that BTP-2 had not been properly authorized because SHPD had failed to consult with the KNIBC and appropriate Hawaiian organizations before approving BTP-2, as required by HRS § 6E-43(d)[8] and Hawai'i Administrative Rules (HAR) § 13-300-38(e).[9]  The Circuit Court ordered SHPD to engage in the necessary consultation, but declined to enjoin Brescia from continuing with the construction of his residence.  The Circuit Court's October 2, 2008, "Order Granting in Part and Denying in Part [Chandler's] Motion for Preliminary Injunction" (October 2, 2008, Order) provided as follows:

---

[7] HRS § 6E-13(b) provides:

(b) Any person may maintain an action in the trial court having jurisdiction where the alleged violation occurred or is likely to occur for restraining orders or injunctive relief against the State, its political subdivisions, or any person upon a showing of irreparable injury, for the protection of an historic property or a burial site and the public trust therein from unauthorized or improper demolition, alteration, or transfer of the property or burial site.

Effective July 1, 2015, HRS § 6E-13(b) has been amended to substitute the term "environmental court" for "trial court."  2014 Haw. Sess. Laws Act 218, §§ 8, 11 at 739-40.

[8] HRS § 6E-43(d) (2009) provides: "Within ninety days following the final determination [of preservation in place or relocation], a preservation or mitigation plan shall be approved by the department in consultation with any lineal descendants, the respective council, other appropriate Hawaiian organizations, and any affected property owner."

[9] HAR § 13-300-38(e) (1996) provides:

(e) Where a council determination to preserve in place is accepted as final, the applicant shall develop the burial site component of the preservation plan consisting of the requirements of section 13-300-33(b)(3)(A) and any accepted recommendations relating to burial site treatment.  Within ninety days of the council determination, the department shall approve the plan following consultation with the applicant, any known lineal descendants, the appropriate council, and any appropriate Hawaiian organizations.

7

This Court is GRANTING IN PART Defendant's Motion for Preliminary Injunction, until the Department of Land and Natural Resources, State Historic Preservation Division, complies with Chapter 6E, Hawaii Revised Statues, and Hawaii Administrative Rules 13-300; in particular, HRS 6E-43(d) and HAR 13-300-38(e) which require consultation with the Kauai/Niihau Burial Council, any appropriate Hawaiian organizations, and any recognized lineal descendants, on the *revised* Burial Treatment Plan for the authorized protection and management of the discovered burial sites.

This preliminary injunction **does not** enjoin Plaintiff BRESCIA, from continuing with construction of his residence, provided that the construction does not in any way further demolish, alter, or prevent access, for whatever purposes in the event it is so required by SHPD, after proper consultation, to the seven (7) burials that fall within the footprint of the house plans.

V.

Following the issuance of the Circuit Court's October 2, 2008, Order, Brescia continued construction of his residence. SHPD spent over a year consulting with the KNIBC and Native Hawaiian organizations on multiple revised BTPs submitted by Brescia, including holding meetings, receiving letters, and hearing oral testimony on the revised BTPs. Those consulted by SHPD (other than Brescia) opposed the building of a residence above the burials and testified that such activity does not effectuate the KNIBC's "preservation in place" determination.

Prior versions of Brescia's BTP referenced concrete jackets or CMUs being placed around the burials that fell within the construction footprint of the residence. However, in September 2008, Brescia's consulting archeologist, SCS, decided that CMUs were unacceptable because they would cause greater disturbance to the burials, and instead decided to only put caps on the burials, without notifying SHPD of the change. SHPD found out that concrete caps had been placed on the burials without its approval during a September 2008 site visit. Although SHPD determined that it should have been consulted before this change to the BTP was made, SHPD "ultimately agreed that capping was less invasive and provided the same amount of protection for the []iwi[.]" SHPD requested that a cultural monitor be hired "to check that any further construction complies with the version of

8

the BTP that is ultimately accepted by SHPD" and to ensure "that proper respect is accorded the burials."

VI.

On February 9, 2009, Chandler and Rogers filed a motion for leave to amend their answers and Counterclaims/Third-Party Complaints. They sought to add additional claims to their Counterclaims/Third-Party Complaints for SHPD's alleged: (1) failure to obtain approval of proposed mitigation commitments from the KNIBC in violation of HAR § 13-284-8; (2) violation of its public trust duties; and (3) failure to protect customary and traditional Native Hawaiian rights, in violation of Article XII, Section 7 of the Hawai'i Constitution. By order filed on May 26, 2009, the Circuit Court denied the motion.

On May 28, 2009, Chandler and Rogers filed a motion to enforce the Circuit Court's October 2, 2008, Order by enjoining Brescia from engaging in construction activity on his Property until SHPD approved a burial treatment plan that implemented the preservation in place determination of the KNIBC after proper consultation with the KNIBC and appropriate Hawaiian organizations. Chandler and Rogers argued that construction should be halted because, among other things, the KNIBC had rejected the BPT Brescia proposed in October and November 2008; SHPD had failed to consult with the KNIBC "in a meaningful way" on the latest proposed BTP; and Brescia's continued construction "threaten[ed] to 'foreclose implementing potential options for burial treatment plans that may result from the consultation between the SHPD and the KNIBC[]'" required under the Circuit Court's October 2, 2008, Order.

In response, the State detailed its efforts to consult with the KNIBC and Native Hawaiian organizations and its requests made to Brescia to address concerns raised during the consultation process. The State noted that it had rejected Brescia's eleventh revision of the BTP and had identified additional matters that needed to be addressed. On August 18,

9

2009, the Circuit Court entered an order denying the motion to enforce.

## VII.

On March 8, 2010, SHPD approved the sixteenth revision of the BTP (BTP-16), which included a preservation plan for the burials discovered on the Property, over the opposition of the KNIBC, Chandler, Rogers, and others. SHPD's approval set forth specific conditions and concerns, but allowed Brescia to build his residence above the burials that fell within the footprint of the residence. SHPD addressed the capping of these burials, which the KNIBC and members of the public had opposed as not being respectful and proper, as follows:

> The SHPD however recognizes that the prior determination by the KNIBC that the burials were to be preserved in place, the existence of sizeable shoreline setbacks on the property, and unusual configuration of the lot (with a significant portion of the lot being within the shoreline setback area), leave the applicant with few options for construction of his house. Given the proximity of the construction to the burials, there does need to be some physical or visual protective measures put in place to ensure that the burials near construction are protected and not disturbed. The concrete caps do serve this purpose. At this point in time, the SHPD feels that removing the concrete caps could cause harm to the burials and do afford some level of protection for the burials. The concrete caps will not be removed.

## VIII.

On August 5, 2010, following the approval of BTP-16, Chandler and Rogers entered into a settlement agreement with Brescia, which was filed in the Circuit Court on August 24, 2010. As part of the settlement agreement, Brescia, Rogers, and Chandler agreed to dismiss and release all claims against each other that were asserted or could have been asserted in the underlying action, including all claims arising out of disputes regarding Brescia's Property or the burial treatment plan prior to the effective date of the settlement agreement. In the settlement agreement, Brescia also agreed, subject to specified conditions, to permit Chandler, accompanied by a kahu and members of Chandler's family, to go onto the Property four times a year "to pay respect to the kūpuna on the Property[.]"

In accordance with the settlement agreement, a Stipulated Partial Judgment was filed by the Circuit Court on August 25, 2010, which entered judgment dismissing the claims Brescia, Chandler, and Rogers had asserted against each other. With respect to Chandler's and Rogers's Counterclaims/Third-Party Complaints, judgment was entered in favor of Brescia dismissing all claims against him. Chandler's and Rogers's prayer for injunctive relief in their Counterclaims/Third-Party Complaints -- to enjoin any and all construction on Brescia's Property until the State complied with its responsibilities -- was specifically dismissed with prejudice as to Brescia and the State. The Stipulated Partial Judgment provided that the remaining prayers for relief against the State in Chandler's and Rogers's Counterclaims/Third-Party Complaints shall not be construed as seeking the invalidation of BTP-16 (and specifically BTP-16's preservation plan component), the approval of BTP-16 by SHPD, or any of the permits or other government approvals issued for the Property. The Stipulated Partial Judgment further provided that if Chandler or Rogers prevail against the State on any of the remaining prayers for relief, such relief shall have no force or effect against Brescia or the Property, shall be purely prospective in nature, and shall not be used to contest BTP-16, any approval thereof, or any of the permits or other government approvals issued for the Property.

In effect, the settlement agreement and Stipulated Partial Judgment meant that Chandler and Rogers were giving up any right and ability to challenge the treatment of the burials that had been discovered on Brescia's Property and the effect that the construction of Bresica's residence had on the burials.

IX.

After the Stipulated Partial Judgment was filed, the State, on September 14, 2010, filed a motion for summary judgment or in the alternative for partial summary judgment. The State sought summary judgment on Chandler's and Rogers's remaining claims for declaratory relief on the grounds that: (1) HRS § 6E-

11

13(b) provided an exclusive remedy that barred such remaining claims; (2) Chandler's and Rogers's remaining claims were moot; and (3) Chandler and Rogers did not have standing to assert their remaining claims.  In the alternative, the State sought partial summary judgment on Chandler's and Rogers's claim that the human remains found on the Property were part of a single burial site, arguing that there were no issues of material fact regarding its showing that each of the burials discovered was contained in a separate and distinct burial site.

On September 15, 2010, Chandler and Rogers jointly filed two motions for partial summary judgment, which covered all their claims against the State.  They sought summary judgment on their claims for declaratory relief regarding the State's alleged failure to: (1) preserve in place the burial site on Brescia's Property as determined by KNIBC (Chandler's and Rogers's Count 1); (2) provide information to and properly advise the KNIBC with respect to the proposed construction on Brescia's Property (Chandler's Count 3 and Rogers's Count 4); assure submission of an adequate burial treatment plan for Brescia's Property (Rogers's Count 2) and (4) meaningfully consult with the KNIBC prior to approving BPT-2 (Chandler's 2, Rogers's Count 3).  Chandler and Rogers also sought summary judgment on their request for an injunction prohibiting the State from future breaches of its duties in handling and approving burial treatment plans.

On September 21, 2010, Chandler and Rogers filed a Motion to Amend and/or Supplement their Third-Party Complaints to add factual allegations regarding actions and events that occurred after the filing of their Third-Party Complaints, primarily those related to the State's approval of BTP-16.

On October 4, 2010, the Circuit Court held a hearing on the parties' competing motions for summary judgment and Chandler and Rogers's motion to amend/supplement their Third-Party Complaints.  The Circuit Court agreed with State's arguments in support of its motion for summary judgment and orally ruled that: (1) HRS § 6E-13(b) provided an exclusive remedy, and therefore,

12

Chandler's and Rogers's remaining claims for declaratory relief were barred; (2) their remaining claims were moot; and (3) they did not have standing to assert their remaining claims. The Circuit Court also granted the State's alternative motion for partial summary judgment, ruling that there were no issues of material fact on the State's claim that the human remains discovered on Bresica's Property were contained in separate and distinct burial sites, and were not part of a single burial site.

The Circuit Court denied Chandler and Rogers's motions for partial summary judgment. The Circuit Court stated that while it "was a bit dismayed at the decisions that were made[,]" it would be overstepping the administrative process established by statute if it "were to dictate what it means to preserve in place[.]" The Circuit Court also indicated that if Chandler and Rogers wanted to challenge the State's actions in approving the burial treatment plan for Brescia's Property, they were required to seek injunctive relief pursuant to HRS § 6E-13. Finally, the Circuit Court denied Chandler and Rogers's motion to amend/supplement their Third-Party Complaints.

On October 19, 2010, the Circuit Court filed its order denying Chandler and Rogers's motions to amend/supplement their Third-Party Complaints. On October 27, 2010, the Circuit Court filed three separate orders (1) granting the State's motion for summary judgment; (2) denying Chandler and Rogers's motion for summary judgment regarding Counts I and IV; and (3) denying their motion for summary judgment regarding Counts II and III.[10] Final Judgment was entered on December 15, 2010, and this appeal followed.

DISCUSSION

I.

On appeal, Chandler and Rogers contend that the Circuit Court erred in: (1) granting the State's motion for summary

---

[10] The Circuit Court's orders denying Chandler and Rogers's motions for summary judgment referred to the count numbers used in Rogers's Counterclaim/Third-Party Complaint.

13

judgment or in the alternative for partial summary judgment; (2) denying Chandler and Rogers's motions for summary judgment regarding their claims against the State; and (3) denying Chandler and Rogers's motion to amend or supplement their Third-Party Complaints. In particular, Chandler and Rogers argue that the Circuit Court should have granted their requests for declaratory judgment that: (1) the phrase "preservation in place" as used in HRS § 6E-43 (2009) should be interpreted to preclude the State from permitting a landowner to build on top of burials; and (2) in approving the burial treatment plan for Brescia's Property, the State failed to ensure a meaningful and informed decision-making process under HRS Chapter 6E. They also argue that there are material issues of fact regarding whether the remains found on Brescia's Property were part of a single burial site or were multiple individual burial sites.

As explained below, we conclude that Chandler's and Rogers's settlement of all their claims with Brescia, which includes their agreement not to challenge the construction of his residence or seek to invalidate the approval of the burial treatment plan for the Property, renders this case moot. We further conclude that the exceptions to the mootness doctrine asserted by Chandler and Rogers -- the public interest exception and the exception for issues capable of repetition yet evading review -- do not apply. The issues on which Chandler and Rogers seek declaratory judgment turn on the particular facts of this case, and we conclude that rendering a decision in this moot case is not warranted. We therefore affirm the Circuit Court's decision to grant the State's motion for summary judgment to the extent that the Circuit Court ruled that Chandler's and Rogers's claims against the State were moot, and we do not reach the merits of Chandler's and Rogers's requests for declaratory relief. Because the case is moot, we also do not reach Chandler and Rogers's claim that the Circuit Court erred in denying their motion to amend or supplement their Third-Party Complaints.

14

II.

A.

Before we can consider the substantive merits of Chandler's and Rogers's requests for declaratory judgment, we must determine whether the controversy in this case is moot.

> A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper -- and properly limited -- role of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

Queen Emma Foundation v. Tatibouet, 123 Hawai'i 500, 506-07, 236 P.3d 1236, 1242-43 (App. 2010) (formatting altered; citation omitted).

> The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suitable for determination. Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition. . . .
>
> . . . .
>
> The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.

Wong v. Board of Regents, University of Hawaii, 62 Haw. 391, 394-95, 616 P.2d 201, 203-04 (1980).

B.

This case is moot because the actual, live controversy that formed the basis for this case has been resolved by settlement. Chandler and Rogers filed claims for declaratory and injunctive relief against Brescia and the State to challenge a burial treatment plan that the State had approved for Brescia's Property and to enjoin Brescia from constructing his residence until a burial treatment plan was properly approved. The settlement between Brescia, Chandler, and Rogers, resolved this

controversy. As a result of the settlement, Chandler and Rogers gave up any right or claim they had to challenge the treatment the burials that had been discovered on Brescia's Property, the approval of the burial treatment plan for Brescia's Property, or the construction of his residence.

III.

Chandler and Rogers, however, argue that we should decide the issues relating to their claims for declaratory relief against the State based on two exceptions to the mootness doctrine: (1) the public interest exception; and (2) the exception for issues capable of repetition yet evading review.

A.

When analyzing the public interest exception to the mootness doctrine, we look to "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question." Kaleikini v. Thielen, 124 Hawai'i 1, 13, 237 P.3d 1067, 1079 (2010).

Chandler and Rogers contend that the State misinterpreted the phrase "preservation in place" as used in HRS § 6E-43 in approving a burial treatment plan for Brescia's Property that permitted him to build on top of burials. They request a declaratory judgment that "preservation in place" should be interpreted to preclude the construction of any "building on top of burials."

The State made its decision to approve a burial treatment plan that permitted Bresica's residence to be built over certain burials based on the specific facts and circumstances presented in this case. Although the treatment of historic Native Hawaiian burials is an issue of public importance, the State's determination of an appropriate burial

treatment or preservation plan[11] is a decision made in consultation with parties with an interest in the particular plan and based on facts peculiar to that case, and thus must be done on a case-by-case basis. We conclude that it would not be desirable or in furtherance of the public interest to issue a declaratory judgment based on facts peculiar to this case that would bind and restrict the State's decision-making in all future cases.

1.

HRS § 6E-43, which contains the "preservation in place" language, establishes procedures to be followed where human skeletal remains, which appear to be over fifty years old, are discovered or are known to be buried at any site other than a known, maintained, actively used cemetery. HRS § 6E-43 provides in pertinent part:

> (b) All burial sites are significant and shall be preserved in place until compliance with this section is met, except as provided in section 6E-43.6 [(pertaining to inadvertent discovery of burial sites)]. The appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burial sites is warranted, following criteria which shall include recognition that burial sites of high preservation value, such as areas with a concentration of skeletal remains, or prehistoric or historic burials associated with important individuals and events, or areas that are within a context of historic properties, or have known lineal descendants, shall receive greater consideration for preservation in place. . . . A council's

---

[11] HAR § 13-300-2 defines the terms "burial treatment plan" and "preservation plan" as follows:

"Burial treatment plan" means a plan that meets all necessary requirements as set forth in this chapter and which proposes treatment of burial sites, including preservation in place or relocation, submitted to the department or council, whichever is appropriate, for a determination.

. . . .

"Preservation plan" means the form of mitigation that sets forth appropriate treatment of historic properties, burial sites, or human skeletal remains which are to be preserved in place.

The burial treatment plan ultimately approved by the State for Brescia's Property included a preservation plan for the burials discovered on the Property.

determination shall be rendered within forty-five days of referral by the department unless otherwise extended by agreement between the landowner and the department.

(c) Council determinations may be administratively appealed to a panel composed of three council chairpersons and three members from the board of land and natural resources as a contested case pursuant to chapter 91. In addition to the six members, the chairperson of the board of land and natural resources shall preside over the contested case and vote only in the event of a tie.

(d) Within ninety days following the final determination, a preservation or mitigation plan shall be approved by the department in consultation with any lineal descendants, the respective council, other appropriate Hawaiian organizations, and any affected property owner.

Administrative rules promulgated by DLNR to implement HRS § 6E-43 provide that the applicable island burial council "shall render a determination to preserve in place or relocate previously identified Native Hawaiian burial sites in accordance with [HAR] section 13-300-38 within forty-five days of referral by the department, unless otherwise extended by agreement between the landowner and the department." HAR § 13-300-33(f) (1996). HAR § 13-300-38 (1996), in turn, provides that where no motion for reconsideration or administrative appeal of the council's determination to preserve in place is filed and the council's determination is accepted as final,

the applicant shall develop the burial site component of the preservation plan consisting of the requirements of section 13-300-33(b)(3)(A) [12/] and any accepted recommendations

_____

12/ HAR § 13-300-33(b)(3)(A) (1996) provides:

(b) The applicant shall submit a request to preserve in place or relocate a Native Hawaiian burial site to the department in the form of a burial treatment plan. The department shall assure that the burial treatment plan includes the following information prior to any council determination:

. . . .

(3)    A description of proposed treatment of all burial sites including a statement of preservation in place or relocation:

(A)    In the event preservation in place is proposed, statements describing:

(i)    Short term measures to immediately protect
(continued...)

18

> relating to burial site treatment.  Within ninety days of the council determination, the department shall approve the plan following consultation with the applicant, any known lineal descendants, the appropriate council, and any appropriate Hawaiian organizations.

HAR § 13-300-38(e).

Accordingly, the statute and applicable regulations establish a process by which the burial council is responsible for determining whether a previously identified historic Native Hawaiian burial site will be preserved in place or relocated, with the council's determination subject to an administrative appeal, and DLNR is responsible, where the council's determination to preserve in place is accepted as final, for approving a preservation plan, following consultation with any lineal descendants, the council, other appropriate Hawaiian organizations, and any affected property owner.

2.

As the statute and regulations make clear, DLNR's decision on whether to approve a preservation plan, after the council's determination to preserve in place is accepted as final, should be made on a case-by-case basis.  In other words, whether DLNR's approval of a plan complies with the council's final determination to "preserve in place" depends on the circumstances, the particular features of the plan, and the input received from those who have an interest in the plan.  In particular, in approving a preservation plan, DLNR is required to consult with lineal descendants, the council, other appropriate Hawaiian organizations, and any affected property owner.  It is impossible to know in advance what the circumstances of a case will be, what a particular preservation plan will provide, and

---

12/ (...continued)

> all burial sites including, but not limited to, fencing, buffers, and site restoration; and
>
> (ii)  Long term measures to properly manage and protect all burial sites including, but not limited to, buffers, landscaping, and access by known lineal or cultural descendants[.]

what those who are consulted by DLNR will recommend regarding the proposed preservation measures.  For example, the rules provide that "[t]he council shall give preference for proper treatment of previously identified Native Hawaiian skeletal remains and any burial goods to known lineal descendants."  HAR § 13-300-35(f) (1996).  Depending on the circumstances and the terms of the particular preservation plan, including features such as the vertical and horizontal clearances and buffers between the building and the burials and the means chosen to manage, provide access to, and protect the burials, known lineal descendants may decide to support a plan that authorizes construction over burials.

As the Hawai'i Supreme Court has stated, a declaratory judgment is a discretionary equitable remedy, which a court should be reluctant to grant, especially where governmental action is involved, unless the need for an equitable remedy is clear:

> "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest.  It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."

Application of Air Terminal Services, Inc., 47 Haw. 499, 531, 393 P.2d 60, 78 (1964) (formatting altered) (quoting Eccels v. Peoples Bank of Lakewood Village, 333 U.S. 426, 431 (1948).

3.

The State's decision to approve the burial treatment plan, including its preservation plan component, for Bresica's Property turned on the particular facts applicable to this case. Regardless of the propriety of the State's decision in Brescia's case, it would not serve the public interest to resolve in this case Chandler and Rogers's request for a declaratory judgment interpreting "preservation in place" to preclude the construction of any building over burials that would bind all future cases.

As noted, it is difficult to predict how the issue of a preservation plan's compliance with the council's determination to preserve in place will arise in future cases. It is also difficult if not impossible to predict how particular preservation plans will be viewed in future cases by lineal descendants, the applicable burial council, and others who have an interest in the plan. Nevertheless, Chandler and Rogers are seeking a declaratory judgment in this case to interpret the statutory language in a manner that would foreclose DLNR, as well as the burial councils, from considering certain preservation plan options, an interpretation that would bind all parties in future cases. We conclude that a better approach would be to permit those with an interest in a particular burial treatment or preservation plan for a particular property to be able to fully participate and provide input to DLNR and the burial councils on whether the plan is appropriate and satisfies the preservation in place determination.

In addition, Chandler and Rogers fail to establish the need for imposing such a blanket limitation on the "preservation in place" language through a declaratory judgment. If the State's approval of a preservation plan would violate HRS Chapter 6E requirements, HRS § 6E-13 permits "any person" to maintain an action for a restraining order or injunctive relief against the State or any person upon a showing of irreparable injury. HRS § 6E-13(b).

For these reasons, we conclude that the public interest exception to the mootness doctrine is inapplicable. We conclude that the declaratory judgment sought by Chandler and Rogers is not necessary or desirable for the future guidance of public officers. Rather, given the case-specific circumstances that affect the State's decision to approve a preservation plan, the public interest would be better served if the State's decision was made, and compliance with the "preservation in place" determination was evaluated and reviewed, on a case-by-case basis.

21

B.

We also conclude that the public interest exception does not apply to Chandler and Rogers's claim for declaratory judgment that in approving the burial treatment plan for Brescia's Property, the State failed to ensure a meaningful and informed decision-making process under HRS Chapter 6E.  In particular, Chandler and Rogers seek declaratory judgment that the State: (1) failed to ensure that the burial treatment plan contained complete and accurate information about the location of the burials in relation to the proposed construction; (2) failed to meaningfully consult with the KNIBC in approving the burial treatment plan; and (3) failed to take steps to halt the construction until a burial treatment plan was approved.

In seeking declaratory relief, Chandler and Rogers do not contend that the State's duties, responsibilities, and powers under the applicable statutes and rules are ambiguous or that the applicable law fails to provide clear guidance.  Indeed, they argue that the State's duties, responsibilities, and powers under the applicable law is clear.[13]  Instead of seeking clarification of the law, Chandler and Rogers seek a declaratory judgment that the State violated its obligations under the applicable statutes

---

[13] For example, in support of their claim for declaratory relief that the State failed to ensure that the burial treatment plan contained complete information, Chandler and Rogers cite HAR § 13-300-33(b)(4) (1996), which provides that the State (namely, DLNR) "shall assure that the burial treatment plan includes . . . [m]aps clearly indicating the location of all identified Native Hawaiian burial sites located at the property," including their spacial relationship to any proposed construction.  With respect to Chandler and Rogers's claim that the State failed to meaningfully consult with the KNIBC, they cite HRS § 6E-43(d) and HAR § 13-300-38(e), which provide that the State shall approve a preservation plan "in consultation with" or "following consultation with" any lineal descendants, the respective council, other appropriate Hawaiian organizations, and any affected property owner.  The State does not dispute that it has an obligation to consult in good faith under these provisions.  With respect to their claim that the State failed to halt construction, Chandler and Rogers cite statutory provisions that clearly give the State (1) the power to order a landowner to cease and desist under certain circumstances or to impose penalties on a landowner for violating HRS Chapter 6E, see HRS §§ 6E-10.5(b), -11 (2009), and (2) the authority to acquire historic or cultural properties by purchase, condemnation, or land exchange.  See HRS § 6E-3(2) (2009).

22

and rules in approving the burial treatment plan for Brescia's Property.

We conclude that the declaratory judgment requested by Chandler and Rogers would not serve to provide necessary or desirable future guidance for public officials. The statutory and regulatory provisions cited by Chandler and Rogers in support of their request for declaratory judgment are clear. There is no need for a declaratory judgment to interpret those provisions. The question of whether the State violated its obligations under the law in approving the burial treatment plan for Brescia's Property is moot -- Bresica has completed construction of his residence and Chandler and Rogers have agreed not to challenge the construction or seek to invalidate the burial treatment plan. In addition, the question of whether the State violated its obligations under the law turn on the particular facts of this case, and because no trial was held in this case, many of the underlying facts have not been determined by a trier of fact. Thus, to the extent that Chandler and Rogers are requesting that we decide their request for declaratory judgment on appeal, we conclude that the record is insufficient to determine relief. Under these circumstances, we conclude that the public interest exception to the mootness doctrine does not apply.

C.

Chandler and Rogers rely on Kaleikini v. Thielen, 124 Hawai'i 1, 237 P.3d 1067, in support of their contention that we should apply the public interest exception to the mootness doctrine. However, Kaleikini is clearly distinguishable.

1.

In Kaliekini, the O'ahu Island Burial Council (OIBC) had approved a burial treatment plan submitted by the developer, which provided for the disinterment of Native Hawaiian burial remains or "iwi" discovered at the developer's project site. Id. at 4, 237 P.3d at 1070. Kaleikini's request for a contested case hearing on the OIBC's decision was denied by DLNR. Id. Kaleikini sought judicial review of the denial of her request for

23

a contested case hearing (contested case action), but the circuit court, based on its interpretation of existing case law, ruled that it lacked jurisdiction over Kaleikini's contested case action because no contested case hearing had been held. Id. at 4-5, 8, 237 P.3d at 1070-71, 1074.

In the meantime, Kaleikini filed a separate action in the circuit court seeking declaratory and injunctive relief (declaratory/injunctive relief action) to prevent the removal of the iwi from the project area. Id. at 7, 237 P.3d at 1073. While Kaleikini's appeal of the circuit court's decision in the contested case action was pending in the appellate courts, the parties reached a partial settlement in the declaratory/injunctive relief action regarding the relocation and the reinterment of the burials. Id. at 10-12, 237 P.3d at 1076-78. The parties, however, did not settle Kaleikini's claim in the declaratory/injunctive relief action that DLNR's denial of her request for a contested case hearing was improper, and the circuit court ruled against her on that claim. Id. at 9-10, 237 P.3d at 1075-76. Kaleikini filed appeals in both actions, but the appeal in the declaratory/injunctive relief action was stayed due to the developer's filing for bankruptcy. Id. at 10 n.15, 237 P.3d at 1076 n.15.

In the contested case action, the supreme court held that the question presented -- whether judicial review is available for an agency's denial of a person's request to participate in a contested case hearing relating to the removal of Native Hawaiian burial sites -- was a question of great public importance that fell within the public interest exception to the mootness doctrine. Id. at 13, 237 P.3d at 1079. Evaluating the first and third prongs of the public interest exception, the supreme court found (1) that the question presented was public in nature, citing the public interest in the proper disposition and treatment of Native Hawaiian and other burials; and (2) that the likelihood of the future recurrence of the issue appeared high because iwi would probably continue to be

24

unearthed at future construction projects. Id. With respect to the second prong, the supreme court found that it would be desirable for the supreme court to decide the question to provide authoritative future guidance for public officials. Id. In support of this finding, the supreme court referred to the circuit court's statements that existing case law created confusion over whether an agency's denial of a contested case hearing could ever be subject to judicial review and that there was a need for an authoritative answer to resolve the confusion. Id.

2.

Unlike in this case, the question in Kaleikini directly concerned the availability of judicial review and the jurisdiction of the courts -- fundamental questions of judicial process. The supreme court in Kaleikini emphasized the need to resolve the issue of whether the denial of a contested case hearing precluded judicial review given the confusion surrounding that issue as expressed by the circuit court. Here, Chandler and Rogers's requests for declaratory judgment are not directed at securing judicial review or resolving confusion regarding the jurisdiction of the courts. Unlike Kaleikini, Chandler and Rogers were not denied the opportunity to obtain judicial review of their claims.

Moreover, the question of the availability of judicial review decided by the supreme court in Kaleikini did not turn on the underlying facts of the case. Here, Chandler and Rogers's requests for declaratory judgment depend upon and are intertwined with the particular facts of this case. We therefore conclude that Kaleikini is distinguishable and does not control this case.

IV.

We also conclude that the exception to the mootness doctrine for issues capable of repetition yet evading review does not apply. As noted, HRS § 6E-13(b) provides that "any person" may maintain an action "for restraining orders or injunctive

25

relief against the State, its political subdivisions, or any person upon a showing of irreparable injury, for the protection of an historic property or a burial site and the public trust therein from unauthorized or improper demolition, alteration, or transfer of the property or burial site." Accordingly, HRS § 6E-13(b) provides a means by which individuals may obtain judicial review of, and injunctive relief to prevent, alleged violations of HRS Chapter 6E. Indeed, Chandler and Rogers utilized HRS §6E-13(b) to obtain judicial review of the State's actions in the Circuit Court, and they could have obtained appellate review had they not chosen to settle their dispute with Brescia and thereby render their case moot. Accordingly, the issues raised by Chandler and Rogers do not fall into the category of issues that would evade review in future cases.

V.

Because we affirm the Circuit Court's decision to dismiss Chandler and Rogers' claims for declaratory judgment against the State on mootness grounds,[14] we need not address their challenges on appeal to: (1) the other grounds the Circuit Court relied on in granting the State's motion for summary judgment; (2) the Circuit Court's grant of the State's alternative motion for partial summary judgment; and (3) the Circuit Court's denial of their motions for summary judgment. We also need not address their challenge to the Circuit Court's denial of their motion to amend or supplement their Third-Party Complaints with events that took place after the filing of the original Third-Party Complaints. Because the settlement rendered the case moot, supplementing the pleadings would not have served any useful purpose.

---

[14] Although the Circuit Court cited its determination that the case had become moot as one of its grounds for granting summary judgment, as previously noted, the determination of mootness is not a decision on the merits, but rather results in the dismissal of the claims as nonjusticiable.

26

CONCLUSION

Based on the foregoing, we affirm the Circuit Court's Judgment to the extent that it dismissed Chandler's and Rogers's claims against the State on mootness grounds.

DATED: Honolulu, Hawai'i, May 22, 2015.

On the briefs:

Alan T. Murakami
Camille K. Kalama
Sharla Manley
(Native Hawaiian Legal
Corporation)
for Third-Party Plaintiffs-
Appellants

Pamela K. Matsukawa
Donna H. Kalama
Deputy Attorneys General
for Third-Party Defendants-
Appellees

Chief Judge

Associate Judge

Associate Judge